**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JOHN A. THOMERSON; ERIK GULDAGER; PHALA E. VELARDE; and ELIZABETH WHITE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 2:23-cv-02225-DCN |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| COVERCRAFT INDUSTRIES, LLC, and JASBIR PATEL, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

  This matter is before the court on Magistrate Judge Thomas E. Rogers, III's report and recommendation ("R&R"), ECF No. 31, on resolution of a motion to dismiss and to compel arbitration, which is alternatively a motion to transfer the case. ECF No. 15. Namely, the magistrate judge recommends that the court grant defendants Covercraft Industries, LLC ("Covercraft") and Jasbir Patel's ("Patel") (together, "defendants") motion to dismiss, motion to compel arbitration, or, alternatively, motion to transfer case, ECF No. 15, only as to plaintiffs John A. Thomerson ("Thomerson"), Erik Guldager ("Guldager"), and Elizabeth White ("White"). The magistrate judge recommends that Thomerson, Guldager, and White's claims be transferred to the Western District of Kentucky. The magistrate judge further recommends that the court deny the motion as to plaintiff Phala E. Velarde ("Velarde")[1] and that her claims be severed and retained in this court. For the reasons set forth below, the court adopts in part and rejects in part the R&R and grants in part and denies in part the motion. The court thereafter transfers

---

[1] Thomerson, Guldager, White, and Velarde are collectively "plaintiffs."

1

Thomerson, Guldager, and White's claims to the Western District of Oklahoma.  Velarde is not bound to the arbitration agreement and the § 1404(a) factors do not favor transfer of her claim to the Western District of Oklahoma.  Velarde's claim is accordingly severed and retained in this district.[2]

## I.  BACKGROUND

The R&R ably recites the facts of the case, and the parties do not object to the R&R's recitation thereof.  Therefore, the court will only briefly summarize material facts as they appear in the R&R for the purpose of aiding an understanding of the court's legal analysis.[3]

This dispute arises from plaintiffs' employment with Covercraft as sales management employees.  Within the past several years, Covercraft was acquired by private equity hedge funds—first by Century Park Capital Partners and more recently by Audax Private Equity ("Audax").  Relevant to this suit, Audax installed Patel to lead its takeover team after the acquisition with the purpose of overhauling the company to increase the company's value in a future sale.  One strategy that team used was to reduce the cost of the Covercraft payroll by instituting a mass layoff of Covercraft employees

---

[2] The court addresses venue and choice of law more fully at the end of this order.  However, since that analysis may prompt the parties to file additional briefs, the court finds it useful to reiterate its later conclusion at the beginning of the order.  While the issue of transfer is normally raised by motion, the district court may transfer a case sua sponte if it first gives the parties the opportunity to be heard.  Feller v. Brock, 802 F.2d 722, 729 (4th Cir. 1986).  Upon review of the pleadings and briefs before the court, the undersigned is inclined to transfer the case—namely, Velarde's claim—to a district court in California.  If the parties wish to be heard on the question of transfer to California, the court directs the parties to submit a brief to that effect within twenty-one (21) days of the filing of this order.

[3] The court dispenses with citations throughout and notes that unless the court states otherwise or cites to another source, the facts are gleaned from the complaint, ECF No. 1, and the R&R.

(the "Private Equity Layoff Strategy").  On March 1, 2023, defendants called each of the plaintiffs, and, in some cases, followed up with an email, to inform them that their employment with Covercraft was terminated, that their Covercraft computer connections would be turned off in ten minutes, and that their positions were being eliminated. Plaintiffs allege that the termination decisions were impermissibly based on age and gender.

Plaintiffs allege that the Private Equity Layoff Strategy unequally targeted older employees for termination.  As of that date of termination, Thomerson was sixty-six years old, Guldager was sixty-three years old, and Velarde was sixty-four years old. Plaintiffs point to three examples which allegedly demonstrate that defendants impermissibly terminated Thomerson, Guldager, and Velarde on the basis of age.  First, in or around January 2023, at a Covercraft manager meeting, Guldager asked Patel a question about a proposed action, and Patel allegedly responded, "you're too old to understand."  Second, plaintiffs allege that Patel, who is around fifty years old, has surrounded himself with a management takeover team which consists of individuals who are around forty years of age.  Third, plaintiffs emphasize that defendants opted to lay off half of its sales team but only chose those employees who were in their sixties, with the remaining sales representatives being fifty-six, forty-eight, and thirty-six years of age.

Plaintiffs also allege that the Private Equity Layoff Strategy unequally targeted women employees for termination.  First, Patel staffed his management takeover team primarily with men, with only one female vice president included.  Second, at the SEMA Show in Las Vegas, Patel allegedly addressed the two female plaintiffs White and Velarde with the question, "Am I supposed to know who you are?" which is a

condescension he allegedly did not direct toward any male management attendees.  Third, even though White and Velarde were the only two female sales management employees of the six in that Decisional Unit, "they constituted fifty percent of those sales management employees adversely affected"[4] by the layoffs.  Altogether, plaintiffs rely on these allegations to conclude that defendants' decision to layoff White and Velarde was motivated by an impermissible sex animus.

Defendants assert that in 2016, Covercraft began requiring all of its employees to agree to the terms of its Arbitration Agreement and Dispute Resolution Policy (the "DRP").[5]  The text of the Arbitration Agreement states that the "Employee acknowledges that the Company has a mandatory Dispute Resolution Policy (DRP) which requires binding arbitration to resolve all disputes between the Employee and the Company including any such disputes which may arise out of or relate to employment (see also paragraph 5 below)."  See ECF Nos. 15-2; 15-3; 15-4 (the "Arbitration Agreements"), Arbitration Agreements ¶ 2.  It provides that the DRP covers "any claim or dispute between the Employee and the Company, including any claim or dispute in any way related to or arising out of his/her employment with the Company" and lists specific claims including, inter alia, claims of discrimination, harassment, or retaliation under the ADEA and Title VII, claims under the WARN Act, and claims or disputes with the "Company's owners, directors, managers [and] other employees."  Id. ¶ 5.  The

---

[4] The court infers that the defendants laid off four of the six sales management employees, which included White and Velarde.
[5] The court notes that, when it refers to the "DRP," it is referring to the general company-wide policy in which it enacted arbitration agreements and the Dispute Resolution Policy.  In contrast, when it refers to "Arbitration Agreements," it is referring to the specific attached agreements that at least some of the plaintiffs signed.  See ECF Nos. 15-2; 15-3; 15-4.

Arbitration Agreement further provides that the "Employee understands and acknowledges that by accepting and/or continuing employment with the Company, and thereby agreeing to the terms of the DRP, that both Employee and the Company give up the right to trial by jury in a court of law for all employment-related disputes." Id. ¶ 4. The Arbitration Agreement requires that arbitration occur in Oklahoma City, Oklahoma. Id. ¶ 16.

Defendants have produced signed Arbitration Agreements for Guldager, Thomerson, and White. See ECF Nos. 15-2; 15-3; 15-4. Guldager, White, and Thomerson each claim that their respective signed Arbitration Agreements should be voided. For example, Guldager avers that he was rushed into signing the agreement without reading it during a company meeting. ECF No. 17-3, Guldager Aff. ¶¶ 3–5. White avers that though she signed the Arbitration Agreement while she lived in California, she was not given a copy of the agreement when she asked for it, and that defendants should, therefore, not be able to rely on it. ECF No. 17-5, White Aff. ¶¶ 1, 3, 5. Thomerson avers that, because Covercraft demanded the agreement back while he was out of town, he did not sign it but that his wife signed it for him without him reviewing or understanding it. ECF No. 17-2, Thomerson Aff. ¶¶ 1–7.

Defendants have not produced a signed Arbitration Agreement with Velarde. Defendants note that while they have not located a signed Arbitration Agreement with Velarde, Covercraft required every employee to sign the agreement and would have terminated any employee who refused to sign it. ECF No. 15-5, Klause Aff. ¶¶ 4–6. Denise Klause ("Klause") was Covercraft's Director of Human Resources at the time the DRP was implemented. Id. ¶ 1. Klause avers that she has no recollection of any

employee refusing to sign the arbitration agreements and, in turn, avers that she does not remember needing to terminate any employee's employment based on their refusal to comply with Covercraft's DRP.  Id. ¶¶ 7–8.  Klause specifically recalls that Velarde was employed at Covercraft in its California operations at the time the DRP was rolled out, and Klause made a specific effort to ensure that all California employees signed and returned the arbitration agreements.  Id. ¶¶ 9–10.  In contrast, Velarde avers that she never signed any Arbitration Agreement with either Covercraft or Patel.  ECF No. 17-4, Velarde Aff. ¶¶ 1–2.  Each of the plaintiffs aver that they never entered into any agreements to arbitration with Patel.  Velarde Aff. ¶ 2; Thomerson Aff. ¶ 3; Guldager Aff. ¶ 2; White Aff. ¶ 6.

On May 24, 2023, plaintiffs filed a complaint alleging seven causes of action.[6] ECF No. 1, Compl.  All pretrial proceedings in this case were referred to Magistrate Judge Rogers pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.).  On June 29, 2023, defendants filed a motion to dismiss and/or to compel arbitration, or, alternatively, a motion to transfer case.  ECF No. 15.  On July 12, 2023, plaintiffs filed a response in opposition, ECF No. 17, to which defendants replied on July 19, 2023, ECF No. 20.  On July 23, 2023, plaintiffs filed a motion for

---

[6] Plaintiffs causes of action are detailed in turn: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., Compl. ¶¶ 56–60; (2) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., id. ¶¶ 61–65; (3) breach of contract, id. ¶¶ 66–68; (4) breach of contract accompanied by fraudulent act, id. ¶¶ 69–74; (5) promissory estoppel, id. ¶¶ 75–79; (6) violation of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2102 et seq., id. ¶¶ 80–82; and (7) false light, id. ¶¶ 83–85.  Compl.  Plaintiffs third, fourth, fifth, and seventh causes of action are presumably brought pursuant to South Carolina common law, which the court infers from the plaintiffs' citations to South Carolina caselaw.  See id. ¶¶ 66–78, 83–85.

leave to file a sur reply, ECF No. 23, to which defendants responded in opposition on

July 24, 2023, ECF No. 24.  On January 22, 2024, Magistrate Judge Rogers granted the

motion for leave to file a sur reply, ECF No. 30,[7] and issued a report and

recommendation which recommended that the court grant the motion to transfer as to

Thomerson, Guldager, and White.  ECF No. 31, R&R at 21.  It further recommended the

court deny the motion as to Velarde, and, in so doing, sever Velarde's claims from the

remaining plaintiffs.  Id.  On January 24, 2024, plaintiffs objected to the R&R.  ECF No.

32.  On February 5, 2024, defendants objected to the R&R and filed a response to the

plaintiffs' objections.  ECF No. 33.  Plaintiffs filed a response to the defendants'

objections on February 14, 2024.  ECF No. 36.  As such, this motion has been fully

briefed and is ripe for review.

## II.  STANDARD

### A.  Order on R&R

This court is charged with conducting a de novo review of any portion of the

magistrate judge's R&R to which specific, written objections are made.  28 U.S.C.

§ 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of

the magistrate judge.  See Thomas v. Arn, 474 U.S. 140, 149–50 (1985).  The

recommendation of the magistrate judge carries no presumptive weight, and the

responsibility to make a final determination rests with this court.  Mathews v. Weber, 423

U.S. 261, 270–71 (1976).  The court may "accept, reject, or modify, in whole or in part,

the findings or recommendations made by the magistrate judge . . . or recommit the

---

[7] Plaintiffs did not subsequently file a sur reply, opting to file objections to the
R&R instead and a reply to the defendants' objections.  See ECF Nos. 32; 36.

matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). The court is charged with making a <u>de novo</u> determination of any portion of the R&R to which a specific objection is made. <u>Id.</u>

However, in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error. <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted). Furthermore, "[a] party's general objections are not sufficient to challenge a magistrate judge's findings." <u>Greene v. Quest Diagnostics Clinical Lab'ys, Inc.</u>, 455 F. Supp. 2d 483, 488 (D.S.C. 2006) (citation omitted). When a party's objections are directed to strictly legal issues "and no factual issues are challenged, de novo review of the record may be dispensed with." <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982) (citation omitted). Analogously, <u>de novo</u> review is unnecessary when a party makes general and conclusory objections without directing the court's attention to a specific error in a magistrate judge's proposed findings. <u>Id.</u>

## B. Motion to Compel Arbitration

Courts recognize that the Federal Arbitration Act ("FAA") creates a strong presumption in favor of arbitration. <u>See</u> 9 U.S.C. §§ 1–14. As the Supreme Court has explained, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate." <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 221 (1985). Arbitration "is a matter of consent, not coercion." <u>E.E.O.C. v. Waffle House, Inc.</u>, 534 U.S. 279, 294 (2002); <u>see also</u> <u>Arrants v. Buck</u>, 130 F.3d 636, 640 (4th Cir. 1997) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate."). Thus, arbitration "is a way to

8

resolve those disputes—but only those disputes—that the parties have agreed to submit to

arbitration." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010)

(internal quotation marks and citations omitted).

> The Fourth Circuit has stated that,

> Application of the FAA requires demonstration of four elements: '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 84 (4th Cir. 2016) (quoting

Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 696 n.6 (4th Cir. 2012)).

Although courts must compel arbitration when a party satisfies these four factors, the

standard of review and procedural mechanisms to be applied in resolving these four

factors are less clear. Gibbs v. Stinson, 421 F. Supp. 3d 267, 299 (E.D. Va. 2019), aff'd

sub nom. Gibbs v. Sequoia Cap. Operations, LLC, 966 F.3d 286 (4th Cir. 2020).

"Recently, a number of district courts in the Fourth Circuit have determined the burden of

proof is 'akin to the burden on summary judgment' because motions to compel

arbitration often require courts to consider evidence outside of the pleadings."[8] Id.

---

[8] Alternatively, courts evaluate a motion to compel arbitration under the standards espoused by § 4 of the FAA, which states in relevant part, that the district court will compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Under this standard, there must be a "judicial conclusion" that there is a validly formed, express agreement to arbitrate. Granite Rock Co., 561 U.S. at 303. As another court has noted, "[i]t is unclear what daylight exists, if any, between the two approaches. Both require the party seeking arbitration to offer evidence to satisfy the court that an arbitration agreement actually exists, and both allow the non-moving party to rebut that evidence." Gibbs, 421 F. Supp. 3d at 299 n.51. The court opts to follow the logic of other courts within this district that have considered motions to compel arbitration under the burden of proof that is akin to a motion for summary judgment.

(quoting <u>Novic v. Midland Funding, LLC</u>, 271 F. Supp. 3d 778, 782 (D. Md. 2017), <u>rev'd on other grounds sub nom.</u> <u>Novic v. Credit One Bank, Nat'l Ass'n</u>, 757 F. App'x 263 (4th Cir. 2019)); <u>see also</u> <u>Galloway</u>, 819 F.3d at 85 n.3.  As such, the party asserting an arbitration agreement has the burden to show the making of the agreement.  <u>In re Mercury Constr. Corp.</u>, 656 F.2d 933, 939 (4th Cir. 1981) (en banc), <u>aff'd sub nom,</u> <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1 (1983).  Whether an arbitration agreement has been formed is an issue of state contract law.  <u>Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.</u>, 913 F.3d 409, 415 (4th Cir. 2019).

### C. Forum Selection Clause

The Fourth Circuit has found that a motion to dismiss and compel arbitration is most properly considered under Rule 12(b)(3) for improper venue, noting that "the Supreme Court has characterized an arbitration clause as 'a specialized kind of forum-selection clause.'"  <u>Aggarao v. MOL Ship Mgmt. Co.</u>, 675 F.3d 355, 365 n.9 (4th Cir. 2012) (quoting <u>Scherk v. Alberto-Culver Co.</u>, 417 U.S. 506, 519 (1974)); <u>see also</u> <u>Sucampo Pharms., Inc. v. Astellas Pharma, Inc.</u>, 471 F.3d 544, 550 (4th Cir. 2006).  "Unlike a Rule 12(b)(6) motion, evidence outside the pleadings may be 'freely consider[ed]' in ruling on a Rule 12(b)(3) motion."  <u>Am. Ins. Mktg. Corp. v. 5 Star Life Ins. Co.</u>, 958 F. Supp. 2d 609, 612 (D. Md. 2013) (quoting <u>Sucampo Pharms.</u>, 471 F.3d at 550).  "Without an evidentiary hearing, however, 'the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party.'"  <u>The Hipage Co. v. Access2Go, Inc.</u>, 589 F. Supp. 2d 602, 611

(E.D. Va. 2008) (quoting <u>Essex Ins. Co. v. MDRB Corp.</u>, 2006 WL 1892411, at *2 (D. Md. June 7, 2006)).

### D.  Motion to Transfer

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "The burden is on the movant to show that transfer pursuant to Section 1404(a) is proper."  <u>Va. Innovation Scis., Inc. v. Samsung Elecs. Co.</u>, 928 F. Supp. 2d 863, 867 (E.D. Va. 2013).  "Decisions whether to transfer a case pursuant to 28 U.S.C. § 1404 are committed to the discretion of the transferring judge."  <u>Herring v. LaPolla Indus., Inc.</u>, 2013 WL 12148849, at *3 (D.S.C. Oct. 7, 2013) (quoting <u>Brock v. Entre Computer Ctrs., Inc.</u>, 933 F.2d 1253, 1257 (4th Cir. 1991)).  In making the transfer decision, a court must consider "(1) the weight accorded [the] plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice."  <u>Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.</u>, 791 F.3d 436, 444 (4th Cir. 2015).

### III.  DISCUSSION

No party objects to the R&R's recommendation as to South Carolina choice of law rules requiring the court to apply the substantive law of the place where the contract at issue was formed.  R&R at 6–12.  Consequently, no one objects to the R&R's consideration of the purported arbitration agreements with White, Guldager, and Velarde under California law or the R&R's consideration of the purported agreement with Thomerson under South Carolina law, since those two states are the respective locations

where the parties purportedly formed the agreements.  Id.  Similarly, no party objects to the magistrate judge's conclusion that valid arbitration agreements exist between Guldager and Covercraft, as well as between White and Covercraft, such that their claims must arbitrated pursuant to the agreements.  Id. at 7.  No party objects to the magistrate judge's subsequent conclusion that Patel, as an officer of Covercraft, may enforce the valid arbitration agreements against White and Guldager.  See id. at 13–16.  In the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  Diamond, 416 F.3d at 315.  A review of the record for clear error indicates that the R&R accurately summarized this case and the applicable law.  Accordingly, the court turns to the R&R's recommendations to which the parties object.

The court reviews de novo the magistrate judge's recommendations regarding whether Covercraft has a valid arbitration agreement with Thomerson and whether transfer, rather than dismissal, of those claims for which arbitration is required is the appropriate remedy.  See ECF Nos. 32 at 1–11; 33 at 1–4.  Additionally, both sides object to the magistrate judge's conclusion that Patel may enforce the arbitration agreement against Velarde because neither object to the conclusion that defendants had failed to present sufficient evidence to show that Velarde was bound by the arbitration agreement.[9]  R&R at 11, 15; ECF Nos. 32 at 1; 33 at 5.  Both sides also object to the R&R's remedy of transferring the case to the Western District of Kentucky instead of the Western District of Oklahoma.[10]  R&R at 21; ECF Nos. 32 at 11; 33 at 2–3 n.3, 16.

---

[9] Defendants suggest that the magistrate judge's recommendation as to Velarde was a typographical error.  ECF No. 33 at 2 n.1, 5.

[10] Defendants suggest that the inclusion of Kentucky rather than Oklahoma was a typographical error.  ECF No. 33 at 2–3 n.2, 16.

Initially, the court addresses the final two objections regarding whether Patel may enforce the arbitration agreement against Velarde and the recommendation to transfer this case to the Western District of Kentucky.  R&R at 11, 21; ECF Nos. 32 at 1, 11; 33 at 2–3 n.3, 5, 16.  First, the court finds that the former recommendation, read in full alongside the other text of the R&R, simply lacks clarity but otherwise aligns with the parties' requested interpretation.  Second, the court agrees with the defendants and concludes that the latter recommendation was likely a typographical error.  The substantive recommendations underlying each conclusion clearly shows that the magistrate judge intended to make other recommendations such that the "conclusions" to which the parties object do not accurately reflect the R&R's broader analysis.  See R&R at 4–5, 13–16, 20–21.

First, the magistrate judge analyzed whether Patel may enforce the arbitration agreement and ultimately concluded that if the agreement was validly formed between each plaintiff and Covercraft, he could enforce it against each.  Id. at 13–16.  In relevant part, a clause in the arbitration contract incorporates Patel by reference because it specifies that the DRP covers all claims with Covercraft's owners, directors, managers, and other employees, which includes Patel, who is the company's CEO.  Arbitration Agreement ¶ 5.  The magistrate judge then analyzed whether a non-signatory to the agreement—Patel—could enforce the agreement against each of the plaintiffs.  R&R at 14–15.  The magistrate judge ultimately concluded that, under South Carolina law, Patel could enforce the agreement against Thomerson.  Id.; see also Wilson v. Willis, 827 S.E.2d 167, 174 (S.C. 2019).  Similarly, the magistrate judge concluded that, under California law, Patel could enforce the agreement against White, Guldager, and Velarde.

13

R&R at 15–16; see also Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 240 (Cal. 2012) (enumerating theories for when a contract could be enforced against a nonsignatory).  Thus, the magistrate judge opined who could enforce the agreement, which did not overrule his prior finding as to whether the agreement was validly formed and therefore enforceable.  See R&R at 8–16. Consequently, neither Covercraft nor Patel may enforce the contract against Velarde because the magistrate judge concluded that defendants failed to present sufficient evidence showing that Velarde was bound by the arbitration contract.  Id. at 11, 15–16. Thus, the sentence to which both parties object—that Patel may enforce the arbitration agreement against Velarde—correctly should indicate that Patel may enforce the arbitration agreement against Velarde only if there is an agreement that is validly formed and enforceable.  See R&R at 11, 15; ECF Nos. 32 at 1; 33 at 5.  Here, there is no such agreement.

Second, the magistrate judge recommended that this court transfer the case to the Western District of Kentucky.  R&R at 21.  This recommendation conflicted with the references throughout the R&R that indicated arbitration, should it be compelled, must take place in Oklahoma City.  Id. at 4–5, 20–21 (concluding that the arbitration agreement provides that arbitration must take place in Oklahoma City, Oklahoma). Section 4 of the FAA specifies the appropriate venue in which a court may order arbitration:

> A party . . . may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 . . . for an order directing that . . . arbitration proceed in the manner provided for in [a written] agreement . . . .  The court . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.  The hearing and proceedings, under such agreement, shall be

14

within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4.

Section 4 thus mandates two conditions for a district court to compel arbitration: (1) the arbitration must be held in accordance with the agreement of the parties and (2) the arbitration must be held in the district in which the court sits.  Thus, this court cannot compel the parties to arbitrate in Oklahoma because this court does not sit in that jurisdiction.  See, e.g., Elox Corp. v. Colt Indus., Inc., 952 F.2d 395 (4th Cir. 1991) (per curiam) ("The district court must [] apply a forum selection clause contained in the agreement if such a clause exists . . . [and] if a court orders arbitration, the arbitration must be held in the same district as the court."); Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co., 628 F. Supp. 2d 674, 683 (E.D. Va. 2009) (collecting cases); see also Hetrick Cos. LLC v. IINK Corp., 2024 WL 47408, at *13 (E.D. Va. Jan. 3, 2024) ("[T]he Fourth Circuit has at least implied that it would align itself with the majority position were it squarely presented the issue." (internal quotation marks omitted)); Arctic Glacier U.S.A., Inc. v. Principal Life Ins. Co., 2017 WL 2629043, at *8 (D. Md. June 19, 2017) ("[W]here the parties have elected to arbitrate a matter in a particular forum, and where § 4 directs that arbitration may be compelled only in forum in which the district court is located, it logically follows that the petition must brought in the arbitration forum to comport with § 4.")

When the parties have an agreement to arbitrate a dispute in a jurisdiction other that in which the case is brought, courts use their discretionary powers under 28 U.S.C. § 1404 and transfer the dispute subject to arbitration to the district court in the location where arbitration is mandated.  Arctic Glacier U.S.A., 2017 WL 2629043 at *8; see also

Kiawah Island Util., Inc. v. Westport Ins. Co., 2019 WL 5394200, at *6 (D.S.C. Oct. 22, 2019).  Because the Arbitration Agreement requires arbitration to take place in Oklahoma City, the court finds that transfer is warranted to the District Court for the Western District of Oklahoma.  Consequently, the court finds that the magistrate judge's recommendation erroneously identified the transferee forum as the Western District of Kentucky when the correct forum is the Western District of Oklahoma.  Considering the foregoing, the court finds that it may not compel arbitration between defendants and White and Guldager, respectively, despite the valid arbitration agreements, but it may transfer their claims to the Western District of Oklahoma so that court may compel arbitration in the designated forum.

Having considered the objections to two discrete conclusions included in the order, the court turns to the parties' broader objections as to whether Thomerson and Covercraft validly formed a contract, such that he must also arbitrate his claims.  Finally, the court considers the broader question of whether transfer of the claims, rather than dismissal, is the appropriate remedy.

### A.  Motion to Compel Arbitration

In the underlying motion and briefs, the parties dispute whether each of the plaintiffs entered into an arbitration contract[11] with Covercraft.  As noted above, the court adopts the magistrate judge's recommendation to find that Guldager and White entered into valid arbitration agreements with Covercraft.  See R&R at 7.  Similarly, it adopts the

---

[11] An arbitration contract is a contract between two parties where the purpose of that contract is to require the parties to arbitrate any disputes related to their relationship. See, e.g., Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 65 (2010) (requiring employees to enter into a contract with the company titled "Mutual Agreement to Arbitrate Claims" as a condition to the employee's employment).

magistrate judge's recommendation and finds that Velarde and Covercraft did not enter a binding arbitration agreement.  Id. at 11.  Plaintiffs object to the R&R to argue that Thomerson did not enter into a valid arbitration agreement with Covercraft because his wife signed the contract on his behalf.  ECF No. 32 at 1–11.  They contend he should not be bound by his wife's signature and further argue that under South Carolina law, the arbitration agreement is not valid because it is unconscionable and is not supported by valid consideration.[12]  Id. at 2–11.  In response, defendants argue that this court should deny all of plaintiffs' objections as to the validity of the agreement between Thomerson and Covercraft.  ECF No. 33 at 4–16.

Prior to compelling arbitration, the court must reach the gateway question of whether the parties formed an agreement to arbitrate.  Gateway questions are those questions whose "answer[s] will determine whether the underlying controversy will proceed to arbitration on the merits."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002).  The phrase is applicable to those narrow circumstances where contracting

---

[12] Neither party objects to the magistrate judge's conclusion that South Carolina law determines whether Thomerson entered into an arbitration contract with Covercraft. R&R at 12.  "A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 599–600 (4th Cir. 2004).  South Carolina courts apply the substantive law of the place where the contract at issue was formed if the parties challenge a contract's formation, interpretation, or validity.  See, e.g., O'Briant v. Daniel Constr. Co., 305 S.E.2d 241, 243 (S.C. 1983). This rule applies where a contract's formation, interpretation, or validity is at issue.  Witt v. Am. Trucking Ass'ns, 860 F. Supp. 295, 300 (D.S.C. 1994).  Thomerson lived and worked in South Carolina, his wife was in South Carolina when she signed the Arbitration Agreement, and Elaine Upton, from Covercraft Human Resources, also worked in South Carolina when she contacted Thomerson requiring him to immediately sign the Arbitration Agreement.  R&R at 12.  Consequently, the court agrees with the R&R and finds that South Carolina law governs the question of whether Thomerson and Covercraft validly formed an agreement to arbitrate.

parties would likely have expected a court—not an arbitrator—to have decided the gateway matter, in the absence of clear and unmistakable evidence to the contrary. Id. at 83–84; Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003). These include certain gateway matters such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy (i.e., the applicability of the arbitration clause to the underlying dispute between the parties). Bazzle, 539 U.S. at 452. "[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." Adkins v. Lab. Ready, Inc., 303 F.3d 496, 501 (4th Cir. 2002) (internal quotation marks and citation omitted). "Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." Id. (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). South Carolina's "presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement or to the identity of the parties who may be bound to such an agreement." Wilson, 827 S.E.2d at 173 (internal quotation marks omitted).

The parties do not dispute that the specific claims fall within the substantive scope of the arbitration agreements. R&R at 7. However, the plaintiffs dispute that the arbitration agreement was formed—meaning, whether there is a valid arbitration agreement at all—which is a gateway question this court may answer. Id.; see also Bazzle, 539 U.S. at 452. Specifically, plaintiffs argue that Thomerson never formed an agreement to arbitrate with Covercraft because he never signed the agreement himself,

because the agreement lacked consideration, and because the arbitration agreement was unconscionable.

### 1. Agency

South Carolina law holds that an agent can bind her principal to a contract to the terms of an offer if there is an agency relationship between the two.  See Sampson & Wyatt v. Singer Mfg. Co., 5 S.C. 465, 467 (S.C. 1875) (explaining that an agent can bind his principal if the agent has authority to do so and "duly exercise[s] it").  "Put succinctly, '[a]n agent contracting with the authority of [her] principal binds him to the same extent as if the principal personally made the contract.'"  Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 237 (4th Cir. 2019) (quoting S.C. Ins. Co. v. James C. Greene & Co., 348 S.E.2d 617, 624 (S.C. Ct. App. 1986)).  That proposition can also encompass an agreement to arbitrate made between an agent (for example, Mrs. Thomerson) on behalf of her principal (Thomerson), on the one hand, and a third party (Covercraft), on the other.  See id. (citing Wilson, 827 S.E.2d at 174).

Whether the essential agency relationship exists, and the extent of the agent's authority, is a question of fact under South Carolina law.  See id. (first citing Am. Fed. Bank, FSB v. No. One Main Joint Venture, 467 S.E.2d 439, 442 (S.C. 1996); and then citing Hiott v. Guar. Nat'l Ins. Co., 496 S.E.2d 417, 421 (S.C. Ct. App. 1997)).  The "agency relationship can be proven 'by evidence of actual [authority] or apparent authority."  Id. (alteration in original) (citing R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth., 540 S.E.2d 113, 117 (S.C. Ct. App. 2000)).

Under South Carolina law, "actual authority [must be] expressly conferred upon the agent by the principal."  Id. (citing Richardson v. P.V., Inc., 682 S.E.2d 263, 265

19

(S.C. 2009)).  Apparent authority "can exist where 'the principal knowingly permits the agent to exercise authority, or the principal holds the agent out as possessing such authority.'"  Id. (citing Richardson, 682 S.E.2d at 265).  Whether the agent possesses actual or apparent authority to bind her principal goes to the formation of a contract.  Id. at 238.  Accordingly, if the agent (Mrs. Thomerson) lacked authority to bind her principal (Thomerson) to a contract with a third party (Covercraft), yet purported to do so anyway, no contract was formed between the principal and the third party.  See id.

The magistrate judge applied South Carolina law to determine whether the arbitration agreement between Thomerson and Covercraft may be enforced against Thomerson.  R&R at 11–13.  Thomerson did not sign the agreement himself but likely asked his wife to sign it on his behalf with his name because Covercraft needed it back quickly and Thomerson was out of town.  Id. at 3.  The magistrate judge first noted that the marital relationship by itself was not enough to establish agency.  Id. at 12 (citing Stiltner v. USAA Cas. Ins. Co., 717 S.E.2d 74, 77 (S.C. Ct. App. 2011)).  Thus, he looked to the words and conduct of the parties to determine whether Thomerson's request to his wife and her signing of the agreement established an agency relationship.  Id.  The magistrate judge noted that there was no evidence on the record that Thomerson's wife acted without his knowledge or consent and further concluded that the reasonable inference from Thomerson's affidavit is that he asked his wife to sign the employment documents on his behalf.  Id. at 13.  Moreover, the magistrate judge explained that Thomerson should have realized that allowing his wife to sign the employment documents would likely lead his employer to believe that Thomerson had signed them himself.  Id.; see also Thompson v. Pruitt Corp., 784 S.E.2d 679, 686 (S.C. Ct. App.

2016) ("Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief.").  Consequently, the magistrate judge recommended that this court find that Thomerson cannot avoid the arbitration agreement simply because he allowed his wife to sign it on his behalf.  R&R at 13.

Plaintiffs object and argue that the R&R erred by determining that Thomerson was bound by his wife's signature on the agreement as his agent.  ECF No. 32 at 1.  Thomerson emphasizes the undue pressure that Covercraft exerted on him to immediately return the document.  Id. at 1–2.  He contends that he was "effectively threatened with termination unless he returned the document without having time to read it."  Id. at 2.  Moreover, he highlights that he signed plenty of other documents for Covercraft, such that Covercraft had the means to determine that the signature did not belong to Thomerson.  Id.  He concludes that "it makes absolutely no sense" to conclude that the contract that his wife signed on his behalf "could legally equate to the knowing and voluntary waiver of Thomerson's right to a jury trial."  Id.

In response, defendants argue that plaintiffs' arguments "miss the mark entirely." ECF No. 33 at 6.  First, defendants emphasize that Thomerson has never indicated that he did not tell his wife to sign the agreement on his behalf—if he were to take that position, he would be accusing his wife of forgery—which led the magistrate judge to reasonably conclude that Thomerson asked his wife to sign it on his behalf.  Id.  Second, defendants highlight that the issue of undue influence—even if it were to exist—is irrelevant to the instant agency inquiry.  Id.  The correct inquiry is whether Thomerson executed the agreement or whether he authorized someone to act on his behalf to do so.  Id.  Third,

21

defendants claim that Thomerson "has provided no legal support for his argument that Covercraft had a duty to compare his signature on the Arbitration Agreement to confirm that . . . Thomerson executed the agreement." Id. Thus, defendants urge the court to adopt the magistrate judge's reasoning and find that Thomerson's wife properly acted as his agent when she signed the agreement on his behalf. Id. at 6–7.

"Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him." Froneberger v. Smith, 748 S.E.2d 625, 630 (S.C. Ct. App. 2013) (emphasis omitted) (quoting Frasier v. Palmetto Homes of Florence, Inc., 473 S.E.2d 865, 868 (S.C. Ct. App. 1996)). "Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." Thompson, 784 S.E.2d at 686 (citing Froneberger, 748 S.E.2d at 630). Thus, when Thomerson likely asked his wife to sign the arbitration agreement on his behalf, he either consciously or impliedly represented that she was acting as his agent.[13] See id. Consequently, the mere fact that Mrs. Thomerson

---

[13] The court notes that it is unclear from the briefs and affidavits whether Thomerson asked his wife to sign the Arbitration Agreement on his behalf. See, e.g., ECF No. 17-2, Thomerson Aff. ¶ 5 ("[Covercraft was] in such a rush that my wife Vicki signed the arbitration agreement instead of me so that they could be returned immediately as Covercraft demanded."). There is no evidence or allegation on the record that indicates that Mrs. Thomerson was directly contacted by Covercraft to sign Thomerson's contract or that she signed it for him without his express permission. Moreover, without additional information from the plaintiffs that Covercraft was on notice that Mrs. Thomerson signed for Thomerson, Covercraft would reasonably rely on Thomerson's Arbitration Agreement because Covercraft's copy of Thomerson's Arbitration Agreement shows a signature and a printed name for "John A. Thomerson." ECF No. 15-3 at 4.

signed the Arbitration Agreement on Thomerson's behalf does not prevent it from being a validly formed agreement.[14]

### 2. Consideration

"The necessary elements of a contract are an offer, acceptance, and valuable consideration." Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C. 2003). "In order for a contract to arise, there must be a meeting of the minds of the parties involved with regard to all essential and material terms of the agreement." Hardaway Concrete Co., Inc. v. Hall Contracting Corp., 647 S.E.2d 488, 492 (S.C. Ct. App. 2007) (citing Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989)).

In the arbitration context, a mutual promise to arbitrate constitutes sufficient consideration for the arbitration agreement. O'Neil v. Hilton Head Hosp., 115 F.3d 272, 275 (4th Cir. 1997) (applying South Carolina law). Moreover, in South Carolina, continued at-will employment constitutes sufficient consideration for an arbitration agreement. See, e.g., Towles v. United Healthcare Corp., 524 S.E.2d 839, 845 n.4 (S.C. Ct. App. 1999); Marzulli v. Tenet S.C., Inc., 2018 WL 1531507, at *4 (S.C. Ct. App. Mar. 28, 2018); Morton v. Darden Rests., Inc., 2018 WL 1531634, at *4 (D.S.C. Mar. 2, 2018), report and recommendation adopted, 2018 WL 1524093 (D.S.C. Mar. 28, 2018); Pitt v. Wells Fargo Bank, Nat'l Ass'n, 2022 WL 2068851 (D.S.C. Apr. 1, 2022), report and recommendation adopted, 2022 WL 1421120 (D.S.C. May 4, 2022); Palmer v. Johns Island Post Acute, LLC, 2023 WL 4409038, at *6 (D.S.C. Mar. 7, 2023), report and recommendation adopted, 2023 WL 4117366 (D.S.C. June 22, 2023). Read together, an

---

[14] Additionally, the court notes that defendants are correct: undue influence or even purported coercive actions by Covercraft in requiring the quick execution of the arbitration agreement have no bearing on agency law. ECF No. 33 at 6.

arbitration agreement in the employment context may be supported by valid

consideration <u>either</u> if the parties each promise to arbitrate <u>or</u> if the employee receives

continued at-will employment in exchange for agreeing to arbitrate.[15]

However, there are occasions when courts have found that the inclusion of certain

provisions in an arbitration agreement divests that agreement of consideration.  For

example, it is true that courts have refused to enforce arbitration agreements when the

agreement specifically allows the employer to ignore the results of arbitration.  <u>O'Neil</u>,

115 F.3d at 275.  Another court found that when the consideration for one party's

promise to arbitrate is the other party's promise to do the same, an imperfect mutuality of

obligation[16] may render the parties' respective obligations illusory, and unenforceable

under South Carolina law, for lack of consideration.  <u>See</u> <u>Hooters of Am., Inc. v. Phillips</u>,

39 F. Supp. 2d 582, 617–18 (D.S.C. 1998), <u>aff'd and remanded</u>, 173 F.3d 933 (4th Cir.

---

[15] These two scenarios are not the exclusive examples of valid consideration in the employment arbitration agreement context.  Rather than being an exhaustive list, these two scenarios are merely relevant to the instant inquiry.  Namely, South Carolina courts have independently found each to provide valid consideration to form employment arbitration agreements under South Carolina law.  Thus, the court observes that where either scenario is present in a case disputing whether there is valid consideration, each scenario is sufficient to demonstrate consideration.

[16] There is an imperfect mutuality of obligation where one party, often the employer, retains "an unfettered 'right to decide later the nature or extent of [its] performance' by reserving the authority to modify the [arbitration] [r]ules, or [to] terminate the agreement, at its choice, while denying the same to [the employees]." <u>Hooters of Am., Inc. v. Phillips</u>, 39 F. Supp. 2d 582, 617–18 (D.S.C. 1998) (first alteration in original) (quoting <u>Glascock v. Comm'r of Internal Revenue</u>, 104 F.2d 475, 476 (4th Cir. 1939)), <u>aff'd and remanded</u>, 173 F.3d 933 (4th Cir. 1999).

1999).  Thus, the impact of an illusory promise on the question of consideration may depend on what serves as consideration under the terms of the contract.  See id.

The magistrate judge first noted that "South Carolina courts have not addressed the issue of whether a mutual promise to arbitrate is illusory when the employer retains the right to revoke that promise;" meaning that South Carolina courts have not considered whether valid consideration exists when one party reserves the right to modify the agreement.  R&R at 16.  However, he went on to observe that even without clear precedent on the issue of illusory promises and consideration, "the Arbitration Agreement at issue here is still supported by adequate consideration under South Carolina because continued employment is sufficient consideration to support an arbitration agreement."  Id. at 17 (first citing Pitt, 2022 WL 2068851, at *4; then citing Towles, 524 S.E.2d at 845; and then citing Marzulli, 2018 WL 1531507, at *4).  The magistrate judge subsequently concluded that under South Carolina law, continued employment is sufficient consideration for a contract.  Id. at 18.  Because continued employment provided valid consideration, the magistrate judge did not reach the question of whether an imperfect mutual agreement to arbitrate served as valid consideration under South Carolina law.  See id.

Plaintiffs object to this conclusion and argue that the R&R erred because it concluded that the Arbitration Agreements were supported by consideration.  ECF No. 32 at 2–8.  Similarly, the magistrate judge erred by only evaluating whether an illusory promise impacted consideration when he should have also considered its impact on mutual assent.  Id.  Finally, plaintiffs contend that the magistrate erred by basing his analysis of consideration for Thomerson's agreement on California law, when he should

25

have considered South Carolina law.  Id.  For each argument, plaintiffs emphasize that

the revocation provision[17] included in the Arbitration Agreement does not provide

adequate consideration or allow for mutual assent.

First, the court notes that South Carolina law governing arbitration agreements

clearly states that continued at-will employment constitutes sufficient consideration for

an arbitration agreement.  See, e.g., Towles, 524 S.E.2d at 845 n.4.  Plaintiffs' citation to

a case which stipulated that additional consideration is needed for a noncompete

agreement is irrelevant to the issue of adequate consideration for an arbitration

agreement.  See ECF No. 32 at 7–8 (citing Poole v. Incentives Unlimited Inc., 525 S.E.2d

898 (S.C. Ct. App. 1999), aff'd, 548 S.E.2d 207 (S.C. 2001)).  Consequently, plaintiffs'

_____

[17] Plaintiffs argue that the revocation clause directly conflicts with the Arbitration Agreements' inclusion of a promise to submit to arbitration.  Arbitration Agreement ¶¶ 2, 4, 18.  The relevant section of paragraph 2 indicates, "The Company has a mandatory Dispute Resolution Policy ('DRP') which requires binding arbitration to resolve all disputes between the Employee and the Company . . . ."  Id. ¶ 2.  The relevant section of Paragraph 4 specifies, "Employee understands and acknowledges that by accepting and/or continuing employment with the Company, and thereby agreeing to the terms of the DRP, that both Employee and the Company give up the right to trial by jury in a court of law for all employment-related disputes."  Id. ¶ 4.  Plaintiffs argue that these relevant sections of Paragraphs 2 and 4 conflict with Paragraph 18 which provides the "revocation provision":

> Change, Modification or Discontinuation of DRP: Employee understands and acknowledges that the terms of the DRP in effect at the time a request for arbitration is made will be binding on Employee and the Company.  Employee also acknowledges that the Company reserves the right to change, modify or discontinue this DRP at any time, for any reason upon prior written notice of at least ten (10) business days to the Company's current employees.  Such written notice shall be effective whether provided to Employee personally, by mailing to a last known residential address, by email transmission to personal or Company email account, or by posting in the place of employment.  However, no amendment or termination shall apply to a dispute or claim for which a proceeding has been initiated.

Id. ¶ 18 (emphasis added).  The underlined portion of Paragraph 18 serves as the "revocation provision" for the purposes of this order.  See id.

continued at-will employment by Covercraft constituted sufficient consideration and the court adopts the magistrate judge's recommendation and finds that the Arbitration Agreement is not voided for lack of consideration.  See R&R at 16–18.

Second, the court need not consider plaintiffs' claim that an illusory promise negates mutual assent because it is a new issue raised for the first time in objections.  The Fourth Circuit has held that, "as part of its obligation to determine de novo any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." United States v. George, 971 F.2d 1113, 1118 (4th Cir. 1992), as amended (Aug. 12, 1992).  However, the Fourth Circuit has clarified that "a district court needn't consider new issues raised for the first time in objections, even if it must consider new arguments related to existing issues."  JTH Tax, LLC v. Shahabuddin, 2023 WL 3002746, at *10 (4th Cir. Apr. 19, 2023) (citing Samples v. Ballard, 860 F.3d 266, 271–273 (4th Cir. 2017)); see also Elijah v. Dunbar, 66 F.4th 454, 460 n.3 (4th Cir. 2023) ("[D]istrict court judges are not required to consider new arguments posed in objections to the magistrate's recommendation.").  An issue corresponds to an "asserted ground[] for relief," while an argument is a "position . . . taken in support of or against each asserted ground for relief." Samples, 860 F.3d at 273.

Plaintiffs originally responded to the motion with the argument that "[t]he Arbitration Agreements fail as illusory for lack of consideration."  ECF No. 17 at 3. Throughout the substantive argument that followed the subheading, plaintiffs regularly referenced the purported lack of consideration underlying the arbitration agreement.  See id. at 4–5, 7 ("[T]here is no consideration from the Company's illusory promise of the

binding arbitration which it is entitled to 'discontinue at any time for any reason.'").  The closest that plaintiffs come to referencing mutual assent in their response brief is in reference to consideration.  Id. at 6 ("[T]he arbitration fails as a contract because it lacks the required mutual consideration as being premised on an illusory promise from the company.").  The clear interpretation of plaintiffs' argument is that because Covercraft unilaterally reserved the right to modify the Arbitration Agreement with ten days' notice, the agreement lacked the requisite consideration.  See id. at 5–7.  In contrast, plaintiffs raise the issue of mutual assent for the first time in their objections.  See ECF No. 32 at 6 ("The R&R errs . . . in its determination that the Arbitration Agreements here are supported by continued employment as consideration.  Instead, the issue is whether there was mutual intent to be bound . . . regardless of whether or not there was any legal 'consideration.'").

Plaintiffs correctly identify that consideration and mutual assent are two separate legal issues in contract formation.  See ECF No. 32 at 6; see also Toth v. Square D Co., 712 F. Supp. 1231, 1235 (D.S.C. 1989) ("The essential elements of any contract are mutual assent to be bound, usually demonstrated by offer and acceptance, and exchange of valuable consideration."); Baylor v. Bath, 1 S.E.2d 139, 140 (S.C. 1938) ("As to the existence of the contract itself, generally speaking, the essential elements of any contract are a contractual intent, followed by an actual meeting of the minds of the parties and accompanied by a valid consideration.").  Thus, the court need not consider the new issue

of mutual assent raised for the first time in plaintiffs' objections.  <u>See</u> <u>Samples</u>, 860 F.3d at 273.

Third, plaintiffs misinterpret the R&R to argue that the magistrate judge impermissibly relied on California law in its consideration of whether Thomerson and Covercraft's Arbitration Agreement was supported by valid consideration.  See ECF No. 32 at 5–6.  A review of the R&R indicates that the magistrate judge applied South Carolina law when it reached its conclusions as to whether Thomerson's Arbitration Agreement was supported by valid consideration.  <u>See</u> R&R at 17 ("[T]he Arbitration Agreement at issue here is still supported by adequate consideration under South Carolina law because continued employment is sufficient consideration to support an arbitration agreement.").  Moreover, to the extent that plaintiffs are making a broader argument as to the implied covenant of good faith and fair dealing, the court need not consider it because it is a new issue raised for the first time in objections.  <u>See generally</u> ECF No. 17; <u>Samples</u>, 860 F.3d at 273.  In any event, the question of a breach of the implied covenant

is irrelevant to the question of contract formation, such that it does not impact the validity of the Arbitration Agreements.[18]

Consequently, the court adopts the R&R and finds that Thomerson's Arbitration Agreement with Covercraft was supported by adequate and valid consideration. <u>See</u> R&R at 16–18.

### 3. Unconscionability

A court may invalidate an arbitration agreement based on defenses applicable to contracts generally, including unconscionability. <u>Kindred Nursing Ctrs. Ltd. P'ship v. Clark</u>, 581 U.S. 246, 251 (2017). A determination of whether a contract is unconscionable depends upon all the facts and circumstances of the case. <u>Damico v. Lennar Carolinas, LLC</u>, 879 S.E.2d 746, 755 (S.C. 2022). In analyzing claims of unconscionability in the context of arbitration agreements, the Fourth Circuit has instructed courts to focus generally on whether the arbitration clause is geared towards

---

[18] In South Carolina, "[e]very contract contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." <u>Snyder v. Auto-Owners Ins. Co.</u>, 634 F. Supp. 3d 252, 258 (D.S.C. 2022) (alterations in original) (quoting <u>Shiftlet v. Allstate Ins. Co.</u>, 451 F. Supp. 2d 763, 771 (D.S.C. 2006)). The South Carolina Supreme Court has clarified "that if a party to a contract believes another party to the contract has breached the implied covenant of good faith and fair dealing, the cause of action is simply one for breach of contract." <u>Hall v. UBS Fin. Servs., Inc.</u>, 866 S.E.2d 337, 342 (S.C. 2021). Plaintiffs cite to <u>Hall</u> to explain that "[t]here is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." ECF No. 32 at 6 (citing <u>Hall</u>, 866 S.E.2d at 343). As best the court can tell, plaintiffs provide such an explanation to ensure that the court applies South Carolina law and not California law. <u>See id.</u> However, a review of the R&R indicates that the magistrate judge applied California law to evaluate whether the Arbitration Agreements formed under California law had adequate consideration and did not apply that analysis or conclusion to its review of whether Thomerson's Arbitration Agreement was validly formed under South Carolina law. R&R at 16–17. In the event that this is a concern, the court reassures the plaintiffs that it is applying South Carolina law in its evaluation of whether Thomerson's Arbitration Agreement had adequate consideration.

achieving an unbiased decision by a neutral decision-maker.  See Hooters of Am., 173 F.3d at 938–40.  "There is no specific set of factual circumstances establishing the line which must be crossed when evaluating an arbitration clause for unconscionability . . . .  Instead, [the court] emphasize[s] the importance of a case-by-case analysis in order to address the unique circumstances inherent in the various types of consumer transactions."  Simpson v. MSA of Myrtle Beach, Inc., 644 S.E.2d 663, 674 (S.C. 2007) (distinguishing the facts in Simpson from the facts in Munoz v. Green Tree Financial Corp., 542 S.E.2d 360 (S.C. 2001)).  The Fourth Circuit has advised that a court may find an arbitration agreement unconscionable in "limited circumstances."  Sydnor v. Conseco Fin. Servicing Corp., 252 F.3d 302, 306 (4th Cir. 2001) (citing Hooters of Am., 173 F.3d 933).

To prove the arbitration provision unconscionable, plaintiffs must show that (1) they lacked a meaningful choice as to whether to arbitrate because the arbitration agreement's provisions were one sided, and (2) the terms were so oppressive no reasonable person would make them and no fair and honest person would accept them.  Simpson, 644 S.E.2d at 668; see also Damico, 879 S.E.2d at 755 (adopting the characterization of these two prongs as procedural and substantive unconscionability, respectively).  "In South Carolina, unconscionability is 'due to both an absence of meaningful choice and oppressive, one-sided terms."  Synovus Bank v. Stevens L. Firm, 2020 WL 12788154, at *2 n.3 (D.S.C. July 20, 2020) (quoting York v. Dodgeland of Columbia, Inc., 749 S.E.2d 139, 148 (S.C. Ct. App. 2013)).

The court begins with procedural unconscionability.  "In determining whether an absence of meaningful choice taints [an arbitration contract] courts must consider . . . the

31

relative disparity in the parties' bargaining power, the parties' relative sophistication, and whether the plaintiffs are a substantial business concern of the defendant." <u>Damico</u>, 879 S.E.2d at 755.  "Inequality of bargaining power alone will not invalidate an arbitration agreement." <u>Munoz</u>, 542 S.E.2d at 365 n.5 (citing <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20 (1991)).  Under South Carolina law, adhesion contracts are standard form contracts that are offered on a take-it or leave-it basis with terms that are nonnegotiable.  <u>Munoz.</u>, 542 S.E.2d at 365.  Because contracts of adhesion are non-negotiable, an offeree faced with such a contract has two choices: complete adherence or outright rejection.  <u>Damico</u>, 879 S.E.2d at 756.  Under state law, an adhesion contract is not <u>per se</u> unconscionable, even though it may indicate that one party lacked a meaningful choice.  <u>Munoz</u>, 542 S.E.2d at 365; <u>Damico</u>, 879 S.E.2d at 755.  "Adhesive contracts are not unconscionable in and of themselves so long as the terms are even-handed." <u>Damico</u>, 879 S.E.2d at 756.

Next, the court defines substantive unconscionability.  Under South Carolina law, substantive unconscionability exists where the arbitration contract has "terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." <u>Simpson</u>, 644 S.E.2d at 668; <u>see also</u> <u>Damico</u>, 879 S.E.2d at 755.  In other words, "[s]ubstantive unconscionability attacks are challenges to the terms of a contract." <u>Finch v. Lowe's Home Ctrs., LLC</u>, 2021 WL 2982863, at *8 (D.S.C. July 15, 2021).  Mutuality is a paramount consideration when assessing the substantive

unconscionability of a contract term.  Damico, 879 S.E.2d at 757 (citing 17A Am. Jur. 2d

Contracts § 272 (2016)).

The magistrate judge considered plaintiffs' arguments that the Arbitration

Agreement is unconscionable because it is an adhesion contract, plaintiffs were forced to

accept the contract to remain employed, the terms are one-sided, and Covercraft reserved

the right to change, modify, or discontinue the agreement through the revocation

provision.  R&R at 18–20.  After setting forth the applicable law, he concluded that the

Arbitration Agreement was not unconscionable under South Carolina law because

plaintiffs "point[ed] to no oppressive terms" in the contract.  Id. (citing Hamlin v. Dollar

Tree Stores, Inc., 2017 WL 6034325, at *1 (D.S.C. Dec. 6, 2017)).  Thus, plaintiffs failed

to establish that the Arbitration Agreement was substantively unconscionable.  See id.

Plaintiffs object and contend that the magistrate judge erred by failing to find the

revocation provision to be an oppressive term that renders the Arbitration Agreements

unconscionable.  ECF No. 32 at 8–11.  Plaintiffs cite to Damico to argue that the South

Carolina Supreme Court found that an arbitration agreement was unenforceable when it

contained a term that gave the company sole discretion regarding the conduct of any

arbitration.  Id. at 8–9 (citing Damico, 879 S.E.2d at 751).  They contend that the

revocation provision is similarly one-sided, much like the provision considered in

Damico.  Id. at 9–10.  Plaintiffs thereafter cite to Simpson, 644 S.E.2d at 668, to argue

that no reasonable fair and honest person would agree to a contract that allows one party

the option to exercise a revocation provision.  Id. at 10.  Finally, plaintiffs emphasize that

when the court considers the unconscionability of the Arbitration Agreement, it should

also consider Covercraft's tactics requiring prompt execution of the agreement, which

purportedly did not allow the plaintiffs adequate time to review it, and which provided them no option but to sign it since they would have been terminated if they had refused. Id. at 10–11.  Consequently, plaintiffs urge the court to find the Arbitration Agreement to be unfair, unreasonably oppressive, and, therefore, unenforceable because it is unconscionable.  Id. at 11.  In other words, plaintiffs contend that the Arbitration Agreement is both procedurally and substantively unconscionable.  See id. at 8–11.

The court considers plaintiffs' objections and engages in a de novo review to determine whether the Arbitration Agreements are unconscionable under South Carolina law.[19]  Ultimately, the court agrees with the magistrate judge and finds that plaintiffs have not met their burden to prove either procedural or substantive unconscionability.

The court starts by evaluating whether the Arbitration Agreement is procedurally unconscionable.  First, the Arbitration Agreement is a contract of adhesion, but "[a]dhesive contracts are not unconscionable in and of themselves so long as the terms are even-handed."  Damico, 879 S.E.2d at 756.  Terms included in the Arbitration Agreement include, inter alia: waiver of jury trial, coverage under the agreement of only certain claims brought by the employees, a prohibition against employees bringing a class action, a requirement that Covercraft will pay any administrative fees and all expenses

---

[19] The court observes that plaintiffs alleged that the Arbitration Agreements were procedurally and substantively unconscionable in their response brief by making many of the same arguments that they advance in their objections.  ECF No. 17 at 8–10 (substantive unconscionability); id. at 10–11 (procedural unconscionability); ECF No. 32 at 8–9 (substantive unconscionability); id. at 9–11 (procedural unconscionability).[19] "Courts will not find specific objections where parties 'merely restate word for word or rehash the same arguments presented in [their] filings related to summary judgment.'" Howard v. Saul, 408 F. Supp. 3d 721, 726 (D.S.C. 2019).  The Fourth Circuit recently clarified that "objections need not be novel to be sufficiently specific."  Elijah, 66 F.4th at 460.  Thus, the court engages in de novo review despite the objections' redundancy with the arguments fully considered in the R&R.

and fees of the arbitrator, a requirement that the arbitration will follow the discovery procedures of federal court, a statement that the arbitrator has the same authority to grant monetary damages or other relief as a judge or jury in a court of law would have, and the reservation by Covercraft of the right to change, modify, or discontinue the DRP upon prior written notice of at least ten days.  Arbitration Agreement ¶¶ 4–6, 9–10, 13–14, 18. Taken together, these terms are even-handed and provide each party fair terms despite the unequal bargaining power inherent in adhesive contract.  See Damico, 879 S.E.2d at 756. Thus, it is not procedurally unconscionable.  See id.  The court next evaluates whether the agreement is substantively unconscionable.

In essence, the question before the court is whether the revocation provision included in Paragraph 18 is so one-sided that it makes the entire arbitration contract substantively unconscionable.  See generally ECF Nos. 17 at 8–11; 32 at 8–11.  The parties have not identified a case that is directly on point, and the court has similarly had difficulty finding an identical case applying South Carolina law.

The court finds the district court and Fourth Circuit opinions in Hooters of America instructive.  See 39 F. Supp. 2d 582 (D.S.C. 1998), aff'd, 173 F.3d 933 (4th Cir. 1999).  The district court denied Hooters's motion to compel arbitration because it found the arbitration agreement and incorporated rules were unconscionable and therefore unenforceable.  Hooters of Am., 39 F. Supp. 2d at 612–15.  It also found that the agreement was unenforceable because the agreement had imperfect mutuality of obligation where Hooters retained for itself many additional rights and privileges that its employees lacked—such as the ability to modify the rules without notice or terminate the agreement and procedure with thirty days written notice—such that the promise was

illusory, and the contract lacked adequate consideration.  Id. at 617–18.  Hooters filed an interlocutory appeal.  Hooters of Am., 173 F.3d at 936.  The Fourth Circuit agreed with the district court and found that the arbitration rules and procedures Hooters promulgated were "so one-sided that their only possible purpose [wa]s to undermine the neutrality of the proceeding."  Id. at 938.  That court identified nine examples of the extreme one-sided-ness of that agreement, which included two rules where (1) Hooters, but not the employees, could cancel the agreement to arbitrate with thirty days' notice and (2) where Hooters, but not the employees, could modify the rules in whole or in part whenever it wished, including during an arbitration proceeding.  Id. at 938–39.

In contrast with Hooters, plaintiffs identify just one clause—the revocation provision—to be substantively unconscionable.  Arbitration Agreement ¶ 18; see ECF No. 32 at 8–9.  Importantly, that clause is distinguishable from the similar provision in Hooters because it requires ten days' notice, and it provides that "no amendment or termination shall apply to a dispute or claim for which a proceeding has been initiated."  Arbitration Agreement ¶ 18; see Hooters of Am., 173 F.3d at 938–39.  Taken as a whole, Covercraft's Arbitration Agreement does not seek to undermine the neutrality of the proceeding.  See Hooters of Am., 173 F.3d at 938–40.  In sum, upon de novo review, the court finds that the revocation provision does not render the Arbitration Agreement substantively unconscionable.  Consequently, the Arbitration Agreement is neither procedurally or substantively unconscionable.

Having considered plaintiffs' arguments as to agency, consideration, and unconscionability, the court concludes that Thomerson entered into a valid agreement to

arbitrate with Covercraft such that he may be compelled to resolve this dispute in arbitration.

**B.  Motion to Transfer**

As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so.  See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972). This presumption of enforceability, however, only applies if the forum selection clause is mandatory rather than permissive.  See Albemarle Corp. v. AstraZeneca UK Ltd., 628 F.3d 643, 650–51 (4th Cir. 2010).  A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere.  Id.  A permissive forum selection clause does not justify dismissal on the grounds that the plaintiff filed suit in a forum other than the one specified in the clause.  BAE Sys. Tech. Sol. & Servs., Inc., v. Republic of Korea's Def. Acquisitions Program Admin., 884 F.3d 463, 470 (4th Cir.), as amended (Mar. 27, 2018). When construing forum selection clauses, federal courts have found the particular language of the clause dispositive on whether it authorizes another forum as an alternative to the forum of litigation or whether it makes the designated forum exclusive. Albemarle Corp., 628 F.3d at 651.

The Arbitration Agreement stipulates that "[u]nless otherwise agreed to by the Employee and the Company, arbitration will take place in Oklahoma City, Oklahoma." Arbitration Agreement ¶ 16.  The parties do not opine as to whether this forum selection clause is mandatory versus permissive.  See generally ECF Nos. 15-1; 17; 20; 32; 33; 36. A review of the language indicates that the forum selection clause makes the designated forum exclusive with the exception of those circumstances where the parties agree to

another forum.  <u>See</u> Arbitration Agreement ¶ 16.  Consequently, it is mandatory.  <u>See</u>
<u>Albemarle Corp.</u>, 628 F.3d at 651.

As previously noted, this court cannot compel the parties to arbitrate in Oklahoma
because only courts in the jurisdiction where arbitration is required can compel the
parties to arbitration.  <u>See, e.g.</u>, <u>Elox Corp.</u>, 952 F.2d 395 (per curiam) ("The district
court must [] apply a forum selection clause contained in the agreement if such a clause
exists . . . [and] if a court orders arbitration, the arbitration must be held in the same
district as the court.").  Because the Arbitration Agreement requires arbitration to take
place in Oklahoma City, the court finds that transfer is warranted to the Western District
of Oklahoma pursuant to § 1404(a).  <u>See</u> Arbitration Agreement ¶ 16.

Defendants contend that the magistrate judge erred when he recommended that
this court transfer Thomerson, Guldager, and White's claims, rather than dismiss them
outright.  ECF No. 33 at 2 (citing R&R at 20–21).  Defendants argue that caselaw dictates
that it is the role of the transferee court or arbitrator to decide arbitrability—meaning that
this court was required either to transfer to the Western District of Oklahoma for a
determination of arbitrability and, if applicable, to compel arbitration, <u>or</u> to determine
arbitrability and dismiss the claims.  <u>Id.</u> at 3 (first citing <u>DeLoach v. EK Real Est. Servs.</u>
<u>of NY, LLC</u>, 2022 WL 17625911, at *6 n.3 (D.S.C. Dec. 13, 2022); and then citing
<u>Brumfield v. Kindred Healthcare, Inc.</u>, 2018 WL 3222614, at *4 (D.S.C. July 2, 2018)).
Consequently, defendants conclude that the magistrate judge erred by determining the
arbitration agreements were valid and enforceable for Thomerson, Guldager, and White

and subsequently transferring their cases to another forum.[20]  Id. at 3–4.  Defendants

argue that the magistrate judge should have dismissed plaintiffs' claims, rather than

transfer them.  Id.  Alternatively, defendants request that the court transfer the cases if the

court finds any error in the magistrate judge's analysis of the validity of the arbitration

agreements.  Id. at 4.

In sum, Thomerson, Guldager, and White's claims are governed by a valid,

mandatory forum-selection clause, and that clause has controlling weight in the court's

§ 1404(a) analysis.  See Charleston Advancement Acad. High Sch. v. Acceleration

Acads., LLC, 2020 WL 4016256, at *18 (D.S.C. July 16, 2020).  Because they agreed

with Covercraft to a forum selection clause stipulating that arbitration must occur in

Oklahoma City, and because only a court in the Western District of Oklahoma can

compel arbitration pursuant to those parties' arbitration agreements, Thomerson,

Guldager, and White's claims against Covercraft must be transferred or dismissed.  The

court exercises its discretionary authority and transfers their claims.  While the result of

such a determination is bifurcation of Thomerson, Guldager, and White's claims from

Velarde's claims, the Supreme Court has instructed that courts must enforce an

arbitration agreement even where the result is a bifurcated proceeding "because the

relevant federal law requires piecemeal resolution when necessary to give effect to an

arbitration agreement."  Moses H. Cone Mem'l Hosp., 460 U.S. at 20; see also Byrd, 470

---

[20] The court notes that the magistrate judge properly evaluated the gateway question of arbitrability which this court may reach to determine whether a valid agreement to arbitrate exists.  See R&R at 6–7; Howsam, 537 U.S. at 83.  Upon finding that an agreement to arbitrate existed, the magistrate judge could have either recommended that this court dismiss or transfer the case to the appropriate court that may compel arbitration.  See Arctic Glacier U.S.A., Inc., 2017 WL 2629043, at *8.  The magistrate judge did not impermissibly reach the merits of the underlying dispute.

U.S. at 218, 221 (explaining that the FAA "requires that [courts] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal litigation.'"); accord. KPMG LLP v. Cocchi, 565 U.S. 18, 26 (2011) (per curiam).

To summarize, this court has reviewed for clear error and adopted several of the magistrate judge's recommendations.  First, this court holds that the question of contract formation for Velarde, White, and Guldager's purported arbitration contracts are governed by California law whereas Thomerson's purported arbitration contract is governed by South Carolina law.  See R&R at 6–12.  Furthermore, the court finds no arbitration agreement was formed between Velarde and Covercraft.  Id. at 8–11.  In contrast, the court finds that White and Guldager's respective arbitration agreements with Covercraft are valid.  Id. at 7.  Additionally, the court observes that Patel, as CEO of Covercraft, may enforce the valid arbitration agreements against White and Guldager.  Id. at 13–16.  Consequently, White and Guldager's agreements must be transferred to the Western District of Oklahoma pursuant to the forum selection clauses included in the Arbitration Agreement so that the court may compel arbitration of their agreements in the appropriate forum.

The court subsequently engaged in de novo review of the magistrate judge's recommendations upon the objections filed by both plaintiffs and defendants.  First, the court clarifies that Patel may not enforce the arbitration agreement against Velarde, because no arbitration agreement exists between Velarde and Covercraft.  The court also clarifies that, at a minimum, if the claims at issue should be transferred, it is to the Western District of Oklahoma, not Kentucky, pursuant to the forum selection clauses included in Paragraph 16 of the Arbitration Agreements.  Second, the court evaluated

whether a valid arbitration agreement exists between Thomerson and Covercraft.  Upon review of plaintiffs' allegations of defective agency, lack of consideration, and unconscionability, this court concludes that a valid arbitration agreement exists between Thomerson and Covercraft.  Consequently, Patel may also enforce the valid arbitration agreement against Thomerson.  Third, upon finding valid arbitration agreements between Covercraft and White, Guldager, and Thomerson, respectively, the court considered whether this court may compel arbitration, ultimately finding that it cannot. Subsequently, the court evaluated whether to transfer or dismiss the White, Guldager, and Thomerson's claims, concluding that the relevant factors of § 1404(a) weigh in favor of transfer to the Western District of Oklahoma to compel arbitration to the designated forum of Oklahoma City.

## IV.   CONCLUSION

For the foregoing reasons, the court **ADOPTS IN PART** and **REJECTS IN PART** the R&R and **GRANTS IN PART** and **DENIES IN PART** the motion.  The court **TRANSFERS** Thomerson, Guldager, and White's claims to the Western District of Oklahoma for further proceedings.  The court **SEVERS** Velarde's claims, **DENIES** the motions as to Velarde's claims, and **RETAINS** those claims for further proceedings in this court.[21]

---

[21] The court notes that a district court in California is a more suitable venue for the remaining claims.  Velarde is a resident and citizen of California. Compl. ¶ 1. Covercraft is incorporated in California.  Id. ¶ 2.  All of the facts underlying the causes of action occurred in California, where Velarde worked and resided at the time she was terminated.  See R&R at 3, 8, 10.  It is debatable whether the court must apply South Carolina versus California law for each of Velarde's causes of action.  A federal court exercising supplemental jurisdiction applies the choice of law rules of the forum state. Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr., Inc., 2015 WL 12843916, at *3 (D.S.C. Jan. 20, 2015).  Thus, the court reviews the five claims that Velarde brings

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 25, 2024**
**Charleston, South Carolina**

---

pursuant to supplemental jurisdiction.  See Compl. ¶¶ 66–79, 83–85.  Under South
Carolina choice of law rules, tort claims are governed by the substantive law of the state
in which the injury occurred—in this case, California.  See Butler v. Ford Motor Co., 724
F. Supp. 2d 575, 581 (D.S.C. 2010).  Thus, Velarde's defamation and false light cause of
action is brought pursuant to California law.  See Compl. ¶¶ 83–85.  "Generally, under
South Carolina choice of law principles, if the parties to a contract specify the law under
which the contract shall be governed, the court will honor this choice of law."  Nucor
Corp. v. Bell, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) (citing Bazzle v. Green Tree Fin.
Corp., 569 S.E.2d 349, 358 (S.C. 2002), vacated on other grounds 539 U.S. 444 (2003)).
In the absence of a choice of law provision, South Carolina courts apply the substantive
law of the place where the contract at issue was formed if the parties challenge a
contract's formation, interpretation, or validity.  See, e.g., O'Briant, 305 S.E.2d at 243.
However, where performance is at issue, the law of the place of performance governs.
Livingston v. Atl. Coast Line R.R. Co., 180 S.E. 343, 345 (S.C. 1935).  Velarde's breach
of contract, breach of contract accompanied by a fraudulent act, and promissory estoppel
claims are premised on certain representations in Covercraft's Employee Handbook.  See
Compl. ¶¶ 66–79.  While the court does not have the entire handbook available to review,
plaintiffs attached an excerpt of the handbook which does not specify a choice of law
provision.  See ECF No. 1-7.  Thus, since Velarde resided and worked at Covercraft in
California, it is likely that California law applies to those claims.  See Livingston, 180
S.E. at 345.  While the issue of transfer is normally raised by motion, the district court
may transfer a case sua sponte if it first gives the parties the opportunity to be
heard.  Feller, 802 F.2d at 729.  Upon review of the pleadings and briefs before the court,
the undersigned is inclined to transfer the case to California.  If the parties wish to be
heard on the question of transfer to California, the court directs the parties to each submit
a brief to that effect within twenty-one (21) days of the filing of this order.  For the
convenience of the court, please indicate which district court in California would be the
proper venue: the Northern District of California, the Eastern District of California, the
Central District of California, or the Southern District of California.